J-S24018-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE:  ADOPTION OF L.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  K.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 363 WDA 2025 |

Appeal from the Order Entered March 3, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  28 of 2024

| | | |
|---|---|---|
| IN RE: ADOPTION OF H.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 364 WDA 2025 |

Appeal from the Order Entered March 3, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  OC-029-2024

| | | |
|---|---|---|
| IN RE: ADOPTION OF R.S.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 365 WDA 2025 |

Appeal from the Order Entered March 3, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  OC-030-2024

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY McLAUGHLIN, J.:     **FILED: September 19, 2025**

K.W. ("Mother") appeals from the orders terminating her parental rights to R.S.W., L.M.W., and H.M.W. ("Children"). She challenges the sufficiency of the evidence to establish grounds for termination under 23 Pa.C.S.A. § 2511(a). We affirm.

Mother and C.J.M. ("Father") are biological parents of R.S.W., born January 2021, L.M.W., born February 2022, and H.M.W., born March 2023. Westmoreland County Children's Bureau became involved with the family in December 2021. In May 2022, the court granted the Children's Bureau emergency protective custody of R.S.W. and L.M.W., and the court adjudicated them dependent in July 2022. R.S.W. and L.M.W. were returned to the parents' home on a trial basis in October 2022. In April 2023, after H.M.W. was born, Children again were removed from Mother and Father. The court granted the Children's Bureau emergency protective custody of H.M.W., and adjudicated her dependent.

Mother's case plan objectives included that she was to follow the recommendations from her mental health evaluation, comply with her mental health treatment, follow the therapist's recommendations, comply with relationship counseling services, comply with hands on and/or parenting curriculum, maintain stable housing suitable for Children, maintain a legal and

verifiable source of income, and have supervised visits with Children. Trial Ct. Op., Mar. 3, 2025, at 3.[1]

In May 2024, the Children's Bureau filed a petition for involuntary termination of Mother's rights.[2] The court held a three-day hearing. At the time of the hearing, R.S.W. was almost five years old, L.M.W. was nearly three years old, and H.M.W. was 21 months old.

Dr. Neil Rosenblum testified that in December 2023, he did a psychological evaluation of Mother and her interactions with Children. N.T., Dec. 20, 2024, at 6. He stated that Children were "neutral" when they met Mother and Father, and they had "no sense of excitement." *Id.* at 13. However, Children did not "cry or fuss" when separated from foster parents for the visit. *Id.* Dr. Rosenblum testified Mother "mainly just spoke to" Children, and "overall, she was . . . very, very passive and only intermittently engag[ed] with [C]hildren on a limited basis." *Id.* at 14. He testified that Mother showed "limited" affection toward Children, and responded more when a child would fuss or cry. *Id.* at 15. He stated there "was no sustained affection" and "very little in the way of" praise, encouragement, enthusiasm, or excitement. *Id.*

---

[1] The trial court issued the same decision at each docket. The decision states it addresses termination as to R.S.W. However, the decision discusses all three children.

[2] The Children's Bureau also filed a petition to terminate Father's parental rights, which the court granted. Father did not appeal.

Dr. Rosenblum testified Moher was "gentle, she sustained her attention to [C]hildren, but her level of interaction was very limited." *Id.* He said there was "an absence of her showing [C]hildren how to play with certain toys, or displaying teaching activities." *Id.* He stated that R.S.W. spent much of the time playing by himself, Mother spent more time with L.M.W., and Mother gave very little attention to H.M.W. *Id.* at 16. Mother's strengths were her patience, the "gentle quality to her voice," and her "ability to at least look at what [C]hildren were doing." *Id.* Her deficits were a lack of initiative and enthusiasm and an inability to respond and facilitate additional play when Children would pick up toys. *Id.* at 16-17. Children had no difficulty when Mother left the room. *Id.* at 17.

Dr. Rosenblum testified that during the interview, Mother displayed "the same pattern of a lack of enthusiasm" and had a "very constricted and flat" affect. *Id.* at 23. Mother had difficulty responding to questions and had long pauses, would shrug her shoulders, and displayed an inability to respond to some questions. *Id.* He testified that he rated her judgment as fair and her insight as poor, noting that she can point to concerns with Father and concerns with what Children experienced at home, but she did not understand "the need to take action or resolve those problems." *Id.* at 24. He testified she had no protective capacity. *Id.* at 25.

Dr. Rosenblum diagnosed Mother with social anxiety disorder and an unspecified depressive disorder, a personality disorder with schizoid and dependent characteristics, parental distress with spouse or intimate partner,

and parent/relational problems. *Id.* at 29. He stated Mother showed "a long[-]standing inability to connect with people on an emotional or social level[.]" *Id.* He noted an "emotional distance, a lack of gratification in being around people, a discomfort in being around people," and "difficulties expressing affection, intimacy, or valuing the development of friendships." *Id.* at 29-30. He testified that Mother's relationship with Father "prevents [her] . . . from developing more independence or confidence in herself." *Id.* at 43.

A forensic and behavioral consultant, Carol Hughes, testified that in 2022 and 2023 she conducted forensic psychological evaluations of Mother. *Id.* at 68-69. She stated that Mother said that the referral to the Children's Bureau had occurred due to concerns with Father hitting R.S.W. and Father dropping him into a pack-and-play. Hughes said that Mother "held her hands out, and then opened her hands, like demonstrating that the child was just dropped." *Id.* at 76. Hughes testified that Mother recognized that Children should not be treated that way, but Mother also framed Father's behavior as showing his authority and managing behavior. *Id.* Mother indicated that she did not feel able to intervene when Father smacked Children because Father was "very quick-tempered" and a "ticking time bomb." *Id.* at 77-78. Mother said that when she attempted to intervene, she became the target of his temper. Hughes stated that Mother further relayed that at one point Father grabbed R.S.W., flipped him, and hit him, and Mother did not intervene. *Id.* at 110. Hughes testified that Mother had a flat affect and that she had

concerns with Mother's protective capacity. *Id.* at 106, 112. Hughes further stated that Mother would struggle caring for Children alone. *Id.* at 113.

A clinical psychologist at In-Clusion, Vijaya Greene, testified that she provided non-offender treatment, and then offender treatment, for Mother, starting in August 2022. N.T., Jan. 9, 2025, at 5-6. Greene testified that Mother said the Children's Bureau became involved with the family because there was an incident where Father slammed R.S.W. into the pack-and-play and, after an investigation, bruises were found. *Id.* at 6. Mother reported that she was present and did not intervene. *Id.* Greene testified that the goal of the program was for Mother to identify and implement appropriate measures to ensure Children's safety. *Id.* at 7. Greene said that initially Mother was very engaged in the treatment and provided "fruitful answers to the questions" they worked through. *Id.* Greene testified that in January 2023, there was a setback and Mother regressed—she became quieter, more withdrawn, and did not speak up when needed. *Id.* at 8. Greene testified Mother and Father were trying to balance their work schedules with Children's schedules and visitation, which led to "regressions in their ability to work together, to get along, to divvy up household responsibilities." *Id.* Greene testified that Children were returned to the home, but again removed a couple months later.[3] *Id.* at 10.

Regarding Children's removal in April 2023, Greene stated that Mother told her that R.S.W. was refusing to eat Easter dinner, and Children's maternal

_____

[3] Greene was on leave when Children were removed in April 2023. N.T., Jan. 9, 2025, at 10.

- 6 -

grandmother encouraged Father to spank R.S.W., and Father did so. *Id.* at 11. Mother was in the room but did not take responsibility for the incident. *Id.* Greene testified that after this, she and Mother reviewed information from the beginning, and there were fluctuations in Mother's effort, as there were points where Mother would disengage and not follow through with assignments. *Id.* at 12. Greene testified Mother had unhealthy interactions with Father, noting Mother reported that Father would "put her down [and] call her names," which affected her self-confidence. *Id.*

Greene also said that Mother struggled to advocate for herself and Children. *Id.* Mother also reported verbal and physical abuse from the maternal grandmother. *Id.* at 13. Greene testified that Mother struggled to implement the information from their sessions, and her ability to do so was inconsistent. *Id.* at 14. Greene testified that at one visit, the family dog nipped at L.M.W. *Id.* at 15. Father then forcefully hit their dog twice, and Mother did nothing. *Id.* She said Mother "sat there with [H.M.W.], didn't react to [L.M.W.'s] emotion, didn't react to Father." *Id.* at 15-16.

Rayna Carter testified that she provided non-offender treatment for Mother when Greene was on leave. *Id.* at 21-22. She stated that when Children were removed, Mother stated the removal occurred because Father spanked R.S.W. for not eating his dinner, and a video of the spanking was posted on Facebook. *Id.* at 24. Carter stated that the maternal grandmother secretly recorded the beating. *Id.* Carter stated Mother expressed no concern about the abuse. *Id.*

Kayla Weaver testified she provided individual and group therapy to Mother. *Id.* at 53. Weaver stated Mother was diagnosed with schizoid personality disorder, which is a personality disorder that often presents as a lack of interest in social relationships. She was also diagnosed with bulimia nervosa. *Id.* at 55. Weaver recommended intensive outpatient therapy, and Mother attended 19 of the 25 individual sessions offered and 60 of the 124 group sessions.[4] *Id.* at 55-56. Weaver testified Mother was an active participant in the therapy and made improvements in communication, provided feedback for other group members, and overall showed engagement. *Id.* at 57. Weaver stated Mother's prognosis was "[f]air," due to "barriers in treatment including transportation and attendance." *Id.* at 57-58. She testified Mother's progress was "slower than anticipated." *Id.* at 58. Weaver testified that Mother took responsibility in June 2024 for Children being in agency custody. *Id.* at 60.

Jessica Celesnik of In-Clusion testified that she supervised visits between Mother, Father, and Children. *Id.* at 66. She stated the visits started at the Children's Bureau's office and transitioned to In-Clusion's office. *Id.* at 67. In August 2023, visits transitioned to Mother and Father's home, and then in February 2024, the supervised visits transitioned to therapeutically supervised visits and returned to In-Clusion's office due to behaviors by R.S.W. and L.M.W. *Id.* In February 2024 the visits were moved to the

---

[4] Mother attended twice a week rather than three times, due to her work schedule.

Children's Bureau's office due to safety concerns. *Id.* She testified Mother's goals included "[e]xhibit[ing] appropriate parenting, knowledge, and skills during [her] interactions with [C]hildren and understanding of [C]hildren's various developmental needs; utiliz[ing] appropriate discipline and understanding the importance of appropriate discipline; exhibiting and encouraging positive age-appropriate interactions with [C]hildren and demonstrating the review strategies from [her] parenting curriculum to help manage behaviors and using positive interaction with [C]hildren." *Id.* at 68.

Celesnik testified that Mother presented with "a flat affect" and Celesnik offered many examples of Mother's need for guidance to address Children's needs. *Id.* at 69. She stated Mother would try to interact with Children, and when Children would walk away, Mother would "need some cueing [sic] to redirect [Children]." *Id.* Celesnik testified that Mother and Father gravitated toward R.S.W. and L.M.W., and H.M.W., who was an infant, "would kind of just hang out there." *Id.* When H.M.W. became more mobile, she would be "in a bouncer or a walker and just kind of be there." *Id.* at 70. Weaver said that sometimes a child would have too much food in her mouth, and she had to provide reminders to cut the food smaller and to provide constant supervision. *Id.* at 71. She further testified that Mother would need "cueing" because a child would wonder off or try to climb, but Mother was not receptive. *Id.* Celesnik said that when visits were in the community "[t]here was noticeable tension between the parents," and a lack of communication and preparation. *Id.* at 72. She stated Mother struggled when she had to supervise

two Children, so Father usually would have two and Mother would have one. *Id.* She said Children did not initiate affection with Mother and Mother initiated a "minimal level" of affection with Children. *Id.* at 77-78. Celesnik closed services in April 2024 and at that time the only goal successfully completed was the parenting curriculum. *Id.* at 81-82. She testified that Mother was not capable of parenting Children on her own. *Id.* at 84.

Dr. Richelle O'Malley provided therapeutic play and parenting services to Mother. *Id.* at 93-94. Theraplay is "an evidence-based approach using play that helps promote attachment between a parent and a child." *Id.* at 94. When the sessions started in July 2023, Dr. O'Malley saw "very limited interaction between" Mother and Children. *Id.* at 95. She stated that Mother would sit back and Father would take over and interact with Children. *Id.* Dr. O'Malley asked Father not to engage, because the sessions were for Mother, but the request was rarely successful. *Id.* at 93-95. She said that Mother had a "very flat affect, would often just sit on the couch," and was "pretty passive even with active coaching of what was asked to do." *Id.* at 96. Dr. O'Malley testified she had concerns with Mother's ability to meet Children's developmental and safety needs, and Mother had a difficult time managing more than one child at a time. *Id.* at 98. She stated Mother was unsuccessfully discharged in January 2024 because there had been no progress. *Id.* at 99-100. Dr. O'Malley testified Mother interacted more with R.S.W. than the other children, L.M.W. actively sought out other adults during sessions, and H.M.W. was "just kind of overlooked." *Id.* at 100-01.

Veronica Stein testified that she provided supervised visits for Mother and Father starting in May 2024. N.T., Jan. 23, 2025, at 4-5. She described examples of Mother's difficulty in exerting herself to address Children's needs. Stein said that at the start of services Mother and Father attended together, but only Mother came at the end. *Id.* at 5. Stein testified that Father would strip Children and take pictures of any mark or bruise, and Mother let this happen. *Id.* at 7-8, 10. Stein stated there were safety issues with Children climbing on chairs, pushing chairs towards the sink, trying to climb on the counter, changing tables, or window sills, putting foreign objects in their mouths, and fighting with each other. *Id.* at 10-11. However, Mother would not intervene to address the safety concerns. *Id.* at 11.

Stein testified that Mother's strengths were that she was open to listening to suggestions and was not combative. *Id.* at 14. Stein identified Mother's weaknesses as understanding safety issues. She offered as an example an instance in which Mother continued to clean while Children climbed on the windowsill. *Id.* at 15. Stein testified that when Mother visited without Father, she was unable to tend to Children's safety, instead focusing on "FaceTime calls with [Father]." *Id.* at 17. Stein testified Children did not initiate affection toward Mother and Children went to staff if they needed reassurance. *Id.* at 19-20. Stein testified that during visits L.M.W. would "pull chunks of her hair out and eat it" and R.S.W. would pinch his thighs until they bruised. *Id.* at 20-21. Stein testified that when Father stopped attending

- 11 -

visits, Mother was "much more vocal," and would talk more to the parent educators. *Id.* at 31.

A child therapist, Ashley McKoy, testified that she provided therapy for R.S.W. and L.M.W., starting in September 2023. *Id.* at 35-36. She stated they started therapy because they moved to a new foster home and R.S.W. was exhibiting maladaptive behaviors. He was developmentally delayed, stared off into space, would get very aggressive, was non-compliant, and his foster mother struggled to get him to sleep. *Id.* at 36. She testified that R.S.W.'s and L.M.W.'s behaviors would change when visits were in the home, noting they would play in a corner to themselves. *Id.* at 37. She stated that by the time visits transitioned back to Children's Bureau, R.S.W. was engaging in self-harm by pinching himself and L.M.W. was pulling out fistfuls of hair and vomiting on the way to visits. *Id.* at 38.

McCoy testified that the visits caused "ongoing distress and decompensation of [R.S.W. and L.M.W.]," that R.S.W. was articulating he did not want to go, and that R.S.W. and L.W.W. had behaviors during visits and decompensation after visits. *Id.* at 46. She stated that at visits R.S.W. would become verbally aggressive and would lash out at L.M.W., while similar behavior was not occurring in the foster home. *Id.* at 39. She stated R.S.W. called Father a "monster", R.S.W. and L.M.W. would not use utensils at visits, and R.S.W. pinched himself and regressed in toileting . *Id.* at 40. At preschool, she stated, L.M.W. would "elope," was non-compliant, and was aggressive toward peers. *Id.* L.M.W. also had nightmares. *Id.* at 47. R.S.W. was

aggressive with his peers, but would shut down in the classroom where he would be in a corner and not move. *Id.*

McCoy testified that at the time of the hearing, Children had not seen Mother or Father in four months. R.S.W. was "doing exceptionally well," stating he had progressed in preschool, played appropriately, and sat still. *Id.* at 48-49. She testified L.M.W. also was doing well but still struggled with nightmares. *Id.* at 50. McCoy testified that putting Children back with Mother and Father would "cause grave harm to their mental and emotional well-being." *Id.* at 51. McCoy testified that Children were more receptive to Mother being in the room than Father. *Id.* at 53. She stated however that Children would rarely talk, would only eat, and had no interaction with Mother. *Id.*

Dr. Christine Mahady testified that she is a trauma therapist and that she worked with R.S.W. and L.M.W. starting in August 2024. *Id.* at 57. She was contracted to do EMDR[5] therapy, which is a form of trauma therapy to help information get "unstuck." *Id.* She testified that Children are not ready for visits with Mother, because they associate the family with Father. *Id.* at 66-67. She further stated that Mother did not have the skills and was not present enough to help calm or comfort Children. *Id.* at 67.

The caseworker for Children, Laura Ratica, testified that she was assigned to the case in February 2022. *Id.* at 75-76. She stated the initial referral came in December 2021, after Father became angry at 10-month old

_____

[5] EMDR therapy is Eye Movement Desensitization and Reprocessing therapy.

R.S.W. for crying, removed his diaper, smacked him forcefully on the bottom, and threw him in a pack-and-play. *Id.* at 78. She testified that in May 2022, a provider observed multiple bruises on R.S.W. that resembled fingerprints. *Id.* at 76. According to Mother, Father had removed R.S.W.'s diaper and forcefully smacked him with an open hand. *Id.* R.S.W. and L.M.W. were in placement from May 2022 until October 2022, when they returned home. *Id.* at 76-77. H.M.W. was born in March 2023. Ratica testified that in April 2023, Children were again removed from the home after maternal grandmother videotaped Father repeatedly smacking R.S.W. on the bottom because R.S.W. would not eat. *Id.* at 77. Ratica testified that when she asked Mother why she did not stop Father from hitting R.S.W., Mother shrugged her shoulders and said he had been doing it since Children returned. *Id.* at 86. She testified Mother was not upset about Children being removed. *Id.* She stated custody remained with Children's Bureau when Children lived in the home. *Id.* at 77.

Ratica further testified that at one visit, Children were eating while standing on chairs and Mother did not recognize the danger. *Id.* at 87. Mother also did not help H.M.W. after she gagged from shoving too much food into her mouth. *Id.* at 87-88. She stated Mother had limited interactions with Children during the visits, had a flat affect, and showed no excitement. *Id.* at 90. Ratica stated Mother had stable and appropriate housing and was employed. *Id.* She stated that in January 2025 Mother told her that she had not had contact with Father since November 2024, but that they were

observed and photographed together in Father's vehicle outside her home, and exchanged a kiss. *Id.* at 92-93.

The trial court terminated Mother's parental rights under subsections 2511(a)(2), (5), and (8), as well as under Section 2511(b). Mother appealed.

Mother raises the following issues:

> I. Did the trial court err as a matter of law when it determined that pursuant to 23 Pa. C.S. § 2511(a)(1) [Mother] evidenced a settled purpose of relinquishing parental claim to the minor children?

> II. Did the trial court err as a matter of law when it determined that pursuant to Pa. C.S. § 2511(a)(2), [Mother] caused the minor children to be without essential parental care, control or subsistence necessary for the physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal could or will not be remedied by [Mother][?]

> III. Did the trial court err as a matter of law when it determined that pursuant to 23 Pa. C.S. § 2511(a)(5), [Mother] could not remedy the alleged conditions within a reasonable period of time that led to the minor children's removal and placement[?]

Mother's Br. at 3-4 (answers below omitted).

We review an order involuntarily terminating parental rights for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa.Super. 2018). In termination cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of

discretion." ***In re Adoption of K.C.***, 199 A.3d 470, 473 (Pa.Super. 2018). We will reverse a termination order "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***In re Adoption of S.P.***, 47 A.3d at 826.

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. ***In re Adoption of K.C.***, 199 A.3d at 473. Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." ***Id.*** (citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. ***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted). To affirm the termination of parental rights, this Court need only affirm the trial court's decision as to any one subsection of section 2511(a). **In re B.L.W.**, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Here, the court found termination proper under subsections 2511(a)(2), (5), and (8),[6] as well as under Section 2511(b). As only one basis for termination under Section 2511(a) is necessary, we will focus on the court's termination of Mother's parental rights under Section 2511(a)(2), which states:

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Section 2511(a)(2) therefore requires the moving party to prove three factors by clear and convincing evidence: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or

---

[6] Mother states the court found termination proper under Section 2511(a)(1), (2), and (5). However, the court found termination proper under Section 2511(a)(2), (5), and (8). It did not make a finding under Section 2511(a)(1).

- 17 -

subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." **In re K.Z.S.**, 946 A.2d 753, 758 (Pa.Super. 2008) (citation omitted). "The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties." **Id.** (citation omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." **Matter of Adoption of M.A.B.**, 166 A.3d 434, 443 (Pa.Super. 2017) (citation omitted).

Mother argues that the evidence did not support the court's finding that termination was proper under Section 2511(a)(2). She points to Stein's testimony that after Father stopped attending visits, Mother was more participative in the education from providers, and open to their teachings. Mother's Br. at 10.

The trial court found that Mother continued to evince an inability to provide Children with essential parental care, control, and safety. Trial Ct. Op at 12. It explained that since Children were removed in May 2022, Mother "only briefly took the requisite corrective action towards rectifying" the Children's Bureau's concerns. **Id.** at 11. The trial court reviewed the testimony presented at the hearing, including, but not limited to, the following.

It noted Celesnik's testimony that Mother had a flat affect during visits with Children; Mother would attempt to engage, but needed assistance to reengage with Children; she and Father would give attention to R.S.W. and

L.M.W., but not pay attention to H.M.W.; and Mother was not receptive to guidance. *Id.* at 12. The court further noted when the visits occurred in the community, there was tension between Mother and Father, and Mother struggled to keep track of more than one child. *Id.* The court found that "Mother demonstrated a lack of comprehension with following the provider's recommendations," and was "not cognizant of safety concerns," noting as an example that "Mother was found cleaning up toys while [R.S.W. and L.M.W.] climbed on the window ledge." *Id.* at 14. The court noted that "[o]nce Father stopped attending visits, Mother was said to have found her voice and started to engage a bit more with [C]hildren." *Id.*

The court further pointed out that R.S.W. engaged in self-harming behavior and was regressing, but that these trauma responses decreased in frequency when visits ceased. *Id.* at 14-15. It noted that McCoy testified that continued visits would create a "grave risk of harm." *Id.* at 15. The court further referenced Dr. Rosenblum's testimony that Mother had limited interaction with Children, Mother offered "little praise, encouragement, and enthusiasm when engaging with" Children, and that she "never demonstrated a sense of enjoyment during the evaluation." *Id.* It noted that Dr. Rosenblum stated "that Mother had become more patient with [Children], focused on what [Children] doing, and changed her overall quality of voice," but her weaknesses included that she "did not desire to engage in prolonged periods of play, lacked overall response, and lacked any initiative." *Id.* The court further noted Hughes' testimony that Mother normalized the bruising found

on Children, that Mother lacked attentiveness at visits, and that she left H.M.W. in her carrier. *Id.* at 17. The court noted Mother "made consistent improvement" in her mental health, but "her overall progress was slower than anticipated." *Id.* at 17-18.

The court pointed out that Mother's relationship with Father was a concern, and that despite her contention that she no longer had contact with Father, there was photographic evidence of an ongoing relationship. *Id.* at 19. The court also noted that Mother engaged in non-offender, and then offender, treatment, but pointed out that in one instance Mother had watched Father spank R.S.W. without intervening and on another occasion "sat on a couch expressionless after witnessing Father violently smack the family dog two times after the dog had nipped at the minor child's face." *Id.* It further noted that in Theraplay sessions, "there was very limited interaction between Mother" and Children. *Id.* at 20. It found Mother "struggled to manage more than one child at a time and the providers would have to assist in caring for" Children, did not learn to meet Children's safety and emotional needs, and was unsuccessfully discharged for lack of progress. *Id.*

The court concluded that "[d]espite the numerous services offered to . . . Mother . . . since the on-set of this dependency case," she continued to demonstrate her "inability to provide the essential parental care, control, and safety for [Children]." *Id.* at 21. It pointed out that "Mother [has] not successfully completed any of the reunification services aside from [her]

employment [and] housing," and concluded the "Children's Bureau ha[d] satisfied its burden under 2511(a)(2)." ***Id.***

The record supports the trial court's findings and it did not abuse its discretion in finding termination proper under Section 2511(a)(2). Mother's conduct established a continued incapacity that caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.[7]

Orders affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

9/19/2025

---

[7] Mother does nnot challenge on appeal the court's determination that termination under Section 2511(b) was in Children's best interest.